**CITY OF BROWNSVILLE, Texas and The Public Utilities Board of the City of Brownsville, Texas, Appellants,**

v.

**PUBLIC UTILITY COMMISSION OF TEXAS, Appellee.**

No. 8818.

Court of Civil Appeals of Texas, Texarkana.

April 30, 1981.

Rehearing Denied April 30, 1981.

John W. Davidson, Russell S. Johnson, San Antonio, for appellants.

Mark White, Atty. Gen. of Texas, Martha Terry, Asst. Atty. Gen., Austin, for appellee.

B. D. St. Clair, McGinnis, Lochridge & Kilgore, Austin, O. C. Hamilton, Jr., Ewers, Toothaker, Ewers, Abbot, Talbot, Hamilton & Jarvis, McAllen, for intervenor Magic Valley.

W. N. Woolsey, Joe N. Pratt, Dyer & Redford, Austin, amicus curiae for Central Power & Light.

CORNELIUS, Chief Justice.

This is an appeal from a judgment of the 126th District Court of Travis County which affirmed in all respects a final order of the Texas Public Utilities Commission. The controversy concerns which utility, the Public Utilities Board of Brownsville (PUB) or Magic Valley Electric Cooperative (MVEC), is authorized to serve seven subdivisions and an elementary school in Cameron County in and around Brownsville. Three utilities, PUB, MVEC and Central Power and Light (C P & L), were certificated in a fifteen county South Texas area by order of the Commission in Docket No. 29 issued on October 14, 1976. Forming the basis for that order was an agreement signed by the utilities whereby their respective areas of service were established, with some areas being designated for service by more than one. The subdivisions and school in controversy were all slightly certificated to MVEC. They are El Tulipan, La Coma, La Villita # 4, La Villita # 5, La Villita # 6, Esperanza Estates and Luna Vista Subdivisions, and the Reynaldo Garza Elementary School. At the time of the certifications, El Tulipan and approximately one-third of La Coma were within the city limits of Brownsville; El Tulipan and La Villita # 4 were being completely served by PUB; and it was also serving 75% to 80% of La Coma.

These three subdivisions and La Villita # 5 were the only subdivisions requiring electric service at the time the controversy arose. The school was under construction and was receiving power from MVEC. All subdivisions and the school are within the Brownsville city limits or within its extra-territorial jurisdiction. In January of 1977, PUB began extending its lines into La Villita # 5 even though it had no certificate of convenience and necessity from the Commission. PUB contends that it was obligated to furnish service to that subdivision, as well as La Villita # 6, pursuant to contracts entered into with the developers of those subdivisions. The contracts were entered into after the effective date of the Public Utility Regulatory Act, but before the order of the Commission in Docket No. 29 was issued.

MVEC filed an application with the Commission on June 30, 1977, for a cease and desist order, alleging that PUB had extended its lines and service into the service area singly certificated to MVEC by the Commission's order in Docket 29. PUB then filed an application for dual certification of the seven subdivisions and the school. MVEC's complaint was docketed as Docket No. 533 and PUB's application for dual certification was docketed as No. 670. The two dockets were consolidated by order issued at a pre-hearing conference on September 15, 1977.

MVEC did not object to PUB being singly certificated to provide electrical service to the three subdivisions where PUB already had lines and was providing electrical power. They were El Tulipan, La Coma and La Villita # 4.

The hearing before the Commission began on October 3, 1977. The hearing examiner filed his findings of fact on January 24, 1978, and they were adopted by the Commission in its order issued February 23, 1978. The order provided that PUB cease extending service to La Villita # 5 and transfer its facilities there to MVEC at actual cost; that MVEC be decertificated and PUB be singly certificated in El Tulipan, La Coma and La Villita # 4; and that

PUB's application for additional certification in La Villita # 6, Esperanza Estates, Luna Vista and Garza Elementary School be denied. The City of Brownsville and PUB appealed to the district court, and after a full trial the district court found that the order of the Commission was supported by substantial evidence and affirmed it in all respects. PUB's appeal raises eleven points of error which contend that the order of the Commission and the judgment of the trial court affirming the order are erroneous and that the judgment must be reversed.

The first two points raise the questions whether PUB was required to obtain a certificate of convenience and necessity before furnishing electrical power to customers in the area singly certificated to MVEC, and whether MVEC was "lawfully furnishing service" to the territory in question within the meaning of the Public Utility Regulatory Act by virtue of the fact that it was certificated in that territory and was willing and able to provide electric power, even though it was not actually then providing power to a consuming facility located in that area.

Section 50(2) of the Public Utility Regulatory Act provides as follows:

"(2) Except as otherwise provided in this article no retail public utility may furnish, make available, render, or extend retail public utility service to any area to which retail utility service is being lawfully furnished by another retail public utility on or after the effective date of this Act, without first having obtained a certificate of public convenience and necessity that includes the area in which the consuming facility is located."

Section 50(2) is a part of Article VII, which is the only article of the Act which expressly applies to public utilities or public utility boards owned or operated by a municipality. For the purposes of Article VII, the term "retail public utility" is defined as including any municipality operating, maintaining or controlling facilities in Texas for providing retail utility service. Thus, by the express provisions of Article VII and

particularly Section 49, which defines retail public utility, and Section 50(2) PUB is required to secure a certificate of public convenience and necessity from the Commission before it extends its retail utility service into an area being lawfully served by another retail public utility. The main thrust of PUB's argument involves the interpretation of the phrase "furnishing service." It interprets the phrase to mean that at least one consuming facility in the area must be actually receiving electricity; otherwise, the area is open to the invading utility, even though certificated to another retail public utility. The Commission and the district court both concluded that MVEC was lawfully furnishing utility service to the territory in question, even though no customers had requested service and even though MVEC's lines were not physically connected to any retail consuming facility. It is undisputed that MVEC had installed all of the facilities and equipment necessary to serve the potential customers in the areas in question, and that at all pertinent times it was ready, willing and able to provide electric power to any customer within those areas.

■ We conclude that MVEC, a retail public utility singly certificated for service to the areas in question, being required by law to serve all the customers in that area, and which now has its facilities and equipment installed and ready to serve all customers who wish service, is "lawfully furnishing service to that area" as meant by Section 50(2), even though no customer was actually using electric power at the time in question. To hold otherwise would, in our judgment, defeat the manifest purpose of the Utility Regulatory Act, which was to establish a comprehensive regulatory system of public utilities. PUB's interpretation of Section 50(2) would frustrate the purposes of the certification process prescribed by the Act by rendering certification largely ineffective. It would promote a race by utilities to connect customers, resulting in wasteful duplication of facilities and available service. New service connections would not necessarily go to the certificated utility, but to the utility which

was the quickest to extend its lines and facilities and persuade customers to accept its service. The phrase "being lawfully furnished" need not mean only that electric power or some other utility product is being actually used. In the larger sense, "furnished" means to provide or make available, implying some degree of active effort to accomplish a desired end. Black's Law Dictionary (4th ed. 1951). The definition of "service" contained in the Act is also helpful in determining its intention. The Act provides that,

"... 'Service' is used in this Act in its broadest and most inclusive sense, and includes any and all *acts* done, rendered, or performed and any and all *things* furnished or supplied, and any and all *facilities* used, furnished, or supplied by public utilities in the performance of their duties under this Act ...". (Emphasis added.)

Thus, service is defined in terms of acts, things and facilities, not merely in terms of electric power or other utility products.

PUB argues that Section 50(2), by referring to a consuming facility located in an area, intended to require that there be at least one facility receiving electric power before certification of an invading municipal utility would be required. We cannot give the Act that interpretation. The existence of a consuming facility is not the trigger of the Act's provisions. Consuming facility, as used in Section 50(2), refers to the facility sought to be served by the invading utility, not a facility being served by the certificated utility. Stated another way, the Act means that a utility cannot serve a facility in an area where service is being lawfully furnished by another utility without first obtaining a certificate which includes the area in which the facility sought to be served is located.

PUB next asserts that it is not subject to the jurisdiction of the Public Utilities' Commission in this instance. Two arguments are relied upon to support this contention: (1) the City of Brownsville is a home rule city and its constitutional and statutory power to extend utility service to areas

within its extra-territorial jurisdiction was not expressly or impliedly repealed by the Utility Regulatory Act, and (2) if the Act can be construed as extending the Commission's jurisdiction to home rule cities, it is unconstitutional because the caption is inadequate to clearly express that purpose. See Tex.Const. Art. III, § 35.

▮ A home rule city is possessed of all powers of the state not inconsistent with the constitution, the general laws, or the city's charter. Tex.Const. Art. XI, § 5; *Lower Colorado River Authority v. City of San Marcos*, 523 S.W.2d 641 (Tex.1975). Included in those powers is that of operating its own utilities in any manner consistent with the laws, including the right to make service extensions. Tex.Rev.Civ.Stat.Ann. art. 1108 and art. 1175, §§ 12–15, 30. However, the Legislature may impose limitations on the power of home rule cities, provided they are set forth with sufficient clarity. *City of Sweetwater v. Geron*, 380 S.W.2d 550 (Tex.1964); *Dry v. Davidson*, 115 S.W.2d 689 (Tex.Civ.App.—Galveston 1938, writ ref'd). While the Utility Regulatory Act does not expressly repeal Articles 1108 and 1175, its Section 50(2) clearly and unmistakably limits the power of municipalities to extend utility service to areas being lawfully served by other retail utilities, and thus constitutes a permissible legislative limitation on the otherwise plenary powers of home rule cities. *City of Lubbock v. South Plains Electric Cooperative*, 593 S.W.2d 138 (Tex.Civ.App.—Amarillo 1979, writ ref'd n. r. e.).

The Texas Constitution provides in Article III, § 35, that:

"No bill, (except general appropriation bills, which may embrace the various subjects and accounts, for and on account of which moneys are appropriated) shall contain more than one subject, which shall be expressed in its title. But if any subject shall be embraced in an act, which shall not be expressed in the title, such act shall be void only as to so much thereof, as shall not be so expressed."

The caption of the Utility Regulatory Act does not specifically refer to utility services of home rule cities or other municipalities, but it does characterize the Act as one defining public utilities and providing for their regulation, providing for territories and services, providing for regulation of public utility services and rates, and providing procedures for public utility regulation by municipalities. We agree with the holding of the Amarillo Court of Civil Appeals in *City of Lubbock v. South Plains Electric Cooperative*, supra, which held that the Act is not invalid because of inadequacy of the caption. The general rule is that the caption should be liberally construed to uphold its validity if at all possible. *Robinson v. Hill*, 507 S.W.2d 521 (Tex.1974); *C. Hayman Construction Co. v. American Indemnity Co.*, 471 S.W.2d 564 (Tex.1971). A statute will not be invalidated where its provisions relate directly or indirectly to the same general subject, have a mutual connection, and are not foreign to the subject expressed in the caption. *Robinson v. Hill*, supra; *C. Hayman Construction Co. v. American Indemnity Co.*, supra; *Yeary v. Bond*, 384 S.W.2d 376 (Tex.Civ.App.—Amarillo 1964, writ ref'd n. r. e.). The caption need only state the general subject; it need not recite the details. *Robinson v. Hill*, supra; *Yeary v. Bond*, supra.

▮ The caption must give reasonable notice of the contents of the bill to an average legislator or interested citizen. If such a person interested in legislation on a particular subject would be prompted by the title to examine the body of the bill for provisions relating to that subject, then the title is sufficient. But if he would be likely to get the impression from the title that further reading is unnecessary because the bill does not relate to that subject, then the bill is unconstitutional to the extent that it deals with that subject. *C. Hayman Construction Co. v. American Indemnity Co.*, supra. The caption of the Public Utility Regulatory Act satisfies that test. A reading of the caption itself provides reasonable notice that the Act relates to the regulation of public utilities. The average legislator or interested citizen would not likely draw a distinction between public utilities and mu-

nicipally owned public utilities. It is only by reading beyond the caption and into the body of the Act that the reader learns that municipal utilities are defined out of the term "public utility" for most of the purposes of the Act. If the body of the Act must be studied to interpret the caption, as appellants would require, then Texas Const. Art. III, § 35 becomes meaningless. Moreover, if the body of the Act is to be studied, why stop with the definition in Section 3(c) of Article I? If the reader proceeds to the definition of municipally owned public utilities in Subsection (o) of that same section and to the other provisions of the Act, he will observe that the legislature did intend to regulate municipally owned utilities in the limited area specified.

■ Complaint is also made that the Commission did not have jurisdiction to issue a cease and desist order prohibiting PUB from providing service to the areas in question. We disagree. Section 50(2) expressly gives the Commission jurisdiction over municipally owned retail public utility companies to require certification before such utilities can serve an area already being lawfully furnished service. Although there is no express grant of power to the Commission to issue cease and desist orders, and Article XI of the Act which provides for enforcement by court injunction does not specifically provide for that remedy against municipally owned retail public utilities, yet Section 16 of the Act provides that:

" . . . The commission shall make and *enforce* rules reasonably required in the exercise of its powers and jurisdiction, including *rules governing practice and procedure* before the commission. The commission may call and hold hearings, administer oaths, receive evidence at hearings, issue subpoenas to compel the attendance of witnesses and a production of papers and documents, and make findings of fact and decisions with respect to administering the provisions of this Act or the rules, orders, or other actions of the commission." (Emphasis added.)

To hold that the Commission may require certification of retail public utilities in the instances covered by Section 50(2), but that it has no power to enforce its authority in that regard, either by seeking injunctive relief in the courts or by its own orders, would tend to defeat the purposes of the Act and lead to an absurd conclusion. Further, indication of a legislative intent to empower the Commission to issue orders necessary to enforce its jurisdiction is seen in Section 60 of Article VII which expressly authorizes the Commission to issue orders preventing interference by one public utility with the systems of another utility. In this case, the cease and desist order was issued in conjunction with a hearing then in progress concerning the right of PUB to serve the areas in question. We hold that in these circumstances the Commission was authorized to issue the cease and desist order to protect its jurisdiction in the matter and to enforce its ultimate decision. See *Magnolia Petroleum Co. v. Walker*, 125 Tex. 430, 83 S.W.2d 929 (1935); *White v. Cooper*, 415 S.W.2d 246 (Tex.Civ.App.— Amarillo 1967, no writ).

It is also urged that the Commission's order is invalid because it was based upon an insufficient complaint and it was not based upon substantial evidence. The point concerning the complaint argues that it was defective because it failed to contain a statement of the Commission's jurisdiction as required by Rule 052.01.00.032(c)(3) of the Commission's Rules of Practice and Procedure.

■ We find the complaint to be sufficient. It alleged that PUB and MVEC had been certified for service to certain areas by the Commission's order in Docket No. 29 and that PUB had begun extending its service lines into the areas which had been singly certified to MVEC in express violation of the Commission's order entered in that docket. Those allegations constitute a sufficient statement of the Commission's jurisdiction in the matter. We also conclude that the order was supported by substantial evidence. There was evidence that MVEC could serve the existing load in the

areas in question, that it also could serve the areas after full development by upgrading its system, that PUB's ability to serve the areas was not superior to that of MVEC, that dual certification would result in a duplication of service, and that MVEC's rates were at least competitive with those of PUB's. PUB has failed to show an absence of substantial evidence or that the Commission's order was unjust or arbitrary. See *Imperial American Resources Fund v. Railroad Commission of Texas*, 557 S.W.2d 280 (Tex.1977).

It is also asserted that the Commission's order should be overturned because the original agreement between PUB, MVEC and C P & L forming the basis of the Commission's certifications in Docket No. 29 was the result of a mistake, and further that to enforce the order would violate the prohibitions in the United States and the Texas Constitutions against impairment of the obligation of contracts.

The assertion of mistake argues that the original agreement between PUB, MVEC and the C P & L, which established the areas to be served by each of those utilities, was in error as to the boundaries because certain areas were inadvertently included in the areas agreed to be singly certificated to MVEC. These areas were those where PUB had already contracted with the developers to furnish electric service and where it already had some lines and facilities. PUB contends that the intention was that the respective service areas for the utilities would be delineated by the location of their facilities and customers rather than by the geographical area shown on the map which ultimately formed the basis of the certifications. Reformation was sought on either of two grounds: mutual mistake or remediable mistake.

Reformation is available to correct mistakes in a written instrument if the party claiming mistake presents clear, exact and satisfactory evidence that he is entitled to reformation. *Estes v. Republic National Bank of Dallas*, 462 S.W.2d 273 (Tex.1970); *Sun Oil Co. v. Bennett*, 125 Tex. 540, 84 S.W.2d 447 (1935). Generally speaking the mistake must be mutual, i. e., a mistake common to both parties, each laboring under the same misconception in respect to the terms of the instrument. *Sun Oil Co. v. Bennett*, supra. The party seeking reformation must show the true agreement of the parties, and that the instrument incorrectly reflects that agreement because of the mutual mistake. *Champlin Oil & Refining Company v. Chastain*, 403 S.W.2d 376 (Tex.1965); *Estes v. Republic National Bank of Dallas*, supra. PUB has failed to satisfy its burden in this regard. The only evidence supporting its contention that the intended agreement was for the service areas to be delineated according to location of facilities and customers, was the testimony of PUB's former general manager, who stated that the utilities agreed that if two of them had facilities in the same area they would be dually certificated in that area. There is also evidence that there were exceptions to that general agreement. In any event, the evidence falls short of the clear, exact and satisfactory standard, and assuredly was not of such character as to compel the trial court to find mutual mistake. At best PUB has shown a mistake on its part only. But it argues that even this unilateral mistake entitles it to reformation. It relies upon *James T. Taylor & Son, Inc. v. Arlington Independent School District*, 160 Tex. 617, 335 S.W.2d 371 (1960), in support of this proposition. That case involved rescission rather than reformation. Unilateral mistake ordinarily is not a ground for rescission. 13 Tex.Jur.2d Contracts § 256, p. 480. But it may justify relief if the four elements of remediable mistake are present. *James T. Taylor & Son, Inc. v. Arlington Independent School District*, supra. They are: (1) the mistake is of so great a consequence that to enforce the contract would be unconscionable; (2) the mistake relates to a material feature of the contract; (3) the mistake occurred despite the exercise of ordinary care; and (4) the parties can be placed in status quo in the equity sense. The evidence failed to conclusively establish these conditions. To enforce the agreement as written would not be unconscionable as a matter of law. PUB

argues that the loss of the territory would be of great consequence, but in fact it had no more facilities in the area than MVEC and it was not delivering power there. MVEC was serving the Garza School which was then under construction. No evidence is offered by PUB as to the second element, other than a general statement that the mistake is material. In fact, the area involved in Docket No. 29 covered a fifteen-county area, and an area in one county consisting of only four subdivisions and one school would not seem to be material even under the most liberal definition of that term. Furthermore, rescission will not place the parties in status quo in this instance since MVEC has already extended facilities in reliance upon single certification in the territory in question.

Even if the contract had been subject to reformation, the Commission would not be bound to approve the agreement as PUB would have it reformed. Contracts between retail public utilities are not binding unless approved by the Commission. Public Utility Regulatory Act Section 56. Thus, the Commission's action in the instant case could also be considered as a review and an affirmation of its order initially issued in Docket No. 29.

 We also conclude that the Commission's order did not violate the United States or Texas Constitutions' prohibitions against the impairment of contracts.[1] The agreements between PUB and the developers were entered into in June of 1976. The order in Docket No. 29, wherein MVEC was singly certificated to those areas, was entered on October 14, 1976. The Utility Regulatory Act became effective on September 1, 1975. Thus, the Act was in effect at the time the contracts were executed, and it must be considered that they were executed in full recognition of the law and were intended to be subject to or modified by the

law's provisions. *Winder Bros. v. Sterling*, 118 Tex. 268, 12 S.W.2d 127 (1929); *Trinity Portland Cement Co. v. Lion Bonding & Surety Co.*, 229 S.W. 483 (Tex.Com.App. 1921, jdgmt adopted); 13 Tex.Jur.2d Contracts § 165, pp. 352, 353. The obligations of a contract are not impaired, within the meaning of the constitutional provisions, by a statute in effect when the contract was made. *Munday v. Wisconsin Trust Co.*, 252 U.S. 499, 40 S.Ct. 365, 64 L.Ed. 684 (1920); *Lehigh Water Co. v. Easton*, 121 U.S. 388, 7 S.Ct. 916, 30 L.Ed. 1059 (1887); *Barton v. Wichita River Oil Co.*, 187 S.W. 1043 (Tex. Civ.App.—Fort Worth 1916, writ ref'd); *Capital Electric Power Association v. Mississippi Power & Light Co.*, 218 So.2d 707 (Miss.1968); 16 Am.Jur.2d Constitutional Law § 440, p. 787 (1964). Even though the Act provides that Section 50(2) would apply only to extensions of service made on or after one year from the effective date of the Act, the parties must be considered to have recognized the future restrictions on their service and to have contracted with those restrictions in mind.

It is also urged that the Commission's order is invalid because MVEC's intervention was not timely, the Commission's order was not filed within the time prescribed by the Administrative Procedure Act, and also because of the cumulative effect of all of the alleged errors and deficiencies in the proceedings.

 The Commission's Rules of Practice and Procedure require that participants in hearings before the Commission must appear formally by filing their pleadings at least fifteen days in advance of the hearing. MVEC's plea in intervention in PUB's application for dual certification (Docket 670) was not filed until four days before the hearing. However, Docket No. 533 (MVEC's complaint against PUB's proposed

---

1. "No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant

any Title of Nobility." U.S.Const. Art. I, § 10, cl. 1.

"No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made." Tex.Const. Art. I, § 16.

extension of service filed on June 30, 1977) was consolidated with Docket 670 at a pretrial hearing held on August 22, 1977. From that time on there was no question but that the parties were formally opposing the other's complaint or application and the issues appeared to have been fully joined. The consolidated cause was set for trial on all those issues for October 3, 1977. Between the pretrial hearing and the final hearing, both parties undertook extensive discovery and fully explored the questions touching on dual certification and the other issues. In those circumstances we cannot say there was error in the examiner's considering MVEC to be a party to the application for dual certification or in his failing to strike its plea in intervention.

The Commission's order in this proceeding was not filed within sixty days of the hearing as required by the Administrative Procedure Act, Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 16(d) (Supp.1980–1981), but that irregularity does not require reversal. The statute is directory only. *Railroad Commission v. City of Fort Worth*, 576 S.W.2d 899 (Tex.Civ.App.—Austin 1979, writ ref'd n. r. e.). See also *Lewis v. Jacksonville Building & Loan Association*, 540 S.W.2d 307 (Tex.1976); *Lewis v. Nacogdoches Savings & Loan Association*, 540 S.W.2d 307 (Tex.1976). Finally, PUB argues that the cumulative effect of the errors and irregularities it has alleged require that the case be reversed. We disagree. As noted earlier, we do not find reversible error in the proceedings, and any irregularities which may have existed certainly were not such as to have caused the rendition of an improper verdict. Tex.R.Civ.P. 434.

The judgment of the trial court is affirmed.